## DeWitt S. Havens v. Nathan Church.

*Principal and agent—Bailment—Trustee—Statute of limitations— Interest.*

1. On the purchase of a farm, it was agreed between the grantor and grantee that a certain portion of the money which the grantee had secured by mortgaging the farm to a third party should be retained by the agent who made the loan, and be by him used in paying off a prior mortgage when due, or whenever the mortgagee would receive his money. If any surplus remained, it was to be paid to the grantor to apply upon the purchase price of the farm, upon which the remainder of the loan had been applied. Either party had the right to terminate the agreement at any time. The grantee sold the farm, subject to the mortgages, and it was agreed between him and his grantor and the purchaser, and the clerks of the

agent, who still held said deposit, he being absent at the time, and said clerks having sole charge of his business, that the arrangement under which the money was originally deposited should continue in force. And it is held that the clerks had authority to make said agreement.

2. One of said clerks, during the absence of the agent, was induced by a brother of the purchaser, whom he falsely personated, to pay the money to said brother. And, in a suit by the purchaser against the agent to recover the money deposited, it is held that the relation between the agent and said purchaser was not that of bailee and bailor, but one of trustee and *cestui que trust*, and that the payment of the money by mistake to plaintiff's brother did not discharge the agent from liability.

3. The purchaser not being entitled to the money until he had either paid the mortgage or demanded an accounting from the agent, the statute of limitations did not begin to run until the making of such demand.

4. The land was purchased with funds belonging to the estate of the plaintiff's father, and, while the title was taken and held in the name of the plaintiff, his brother was entitled to the use of said money, and was therefore entitled to the use and benefit of the farm, which he received. And it is held that interest upon the money sued for should not be allowed to the plaintiff.

Error to Gratiot. (Daboll, J.) Argued January 25, 1895. Decided February 12, 1895.

*Assumpsit.* Defendant brings error. Judgment modified. The facts are stated in the opinion.

*Camp & Brooks* and *George P. Stone,* for appellant.

*J. L. Potts* and *C. W. Perry,* for plaintiff.

GRANT, J. The findings of fact are as follows:

" On the 24th day of May, 1880, Albinus Pierce owned certain land in Gratiot county, on which there was a mortgage of about $350, running to George Holden. On the said 24th day of May he sold the said land to Mrs. Ellen Ackmoody, by warranty deed; the trade being fully completed, and the papers recorded, on the 15th of December, following.

" On the said 15th day of December, 1880, Ellen Ack-

moody applied to Nathan Church, the defendant in this action, who was at that time conducting a real-estate, abstract, and loan office in Ithaca, to get a loan of $1,250 on her note, secured by a mortgage on said land. Defendant procured a loan for her, taking the mortgage to the Lenawee County Savings Bank of Adrian, for which he was acting as agent in loaning its funds on first mortgage on real estate, and proceeded to pay and get discharged all liens and incumbrances on the said land. Holden, who held the $350 mortgage, refused to take the money on his mortgage, which was not due, having about three years to run. The balance of the money borrowed was to go to Pierce, to apply on the purchase price of the land. The defendant, Church, with Ackmoody's consent, and to protect his principal, the Lenawee County Savings Bank, against having a second mortgage, and with the consent of Pierce, to make good his covenants and agreements in the warranty deed given by him to Ackmoody, reserved and kept the sum of $430 from the amount so loaned, with which to pay off and discharge the Holden mortgage as soon as Holden would accept the same. If there was any overplus or balance remaining after paying the same, it was to be returned to Pierce. This money remained in the bank of Church, Bills & Co., at Ithaca, to the credit of the defendant. Either party could terminate this agreement at any time.

"The matter was allowed to remain in this condition until the 22d day of April, 1881, when the plaintiff, De Witt S. Havens, bought the land in question from Mrs. Ackmoody for the sum of $3,150. De Witt S. Havens is a farmer residing in the state of New York, and purchased the said land for the use of his brother, Alonzo Havens, but took the deed, and has since kept the title to the said land, in his own name.

"On the said 22d day of April, 1881, the plaintiff, De Witt S. Havens, Alonzo Havens, D. D. Ackmoody (acting for his wife, Ellen Ackmoody), and Albinus Pierce met at the office of the defendant, in Ithaca. The title was examined, papers were transferred, and plaintiff paid off the Ackmoody mortgage to the Lenawee County Savings Bank, paying the money to defendant. The Holden mortgage was still unpaid, and the amount that had been reserved to pay the same, as before stated, was still in Church's hands. And it was then and there agreed that the funds so reserved should remain in defendant's hands, to pay off the Holden mortgage, whenever the owner of the same

would accept the same, or the same become due. Defendant, Church, was not present at this meeting; but his clerks, James W. Howd and a Mr. Blackmer, were there, and acted for him, and the business was fully understood by them, they being in charge of the defendant's business at the time. A memorandum was then, by one of said clerks, written on the margin of a book in which a record of the Ackmoody loan was kept, as follows:

" 'D. S. Havens has bought this land subject to this mortgage. This money. is to go to said Havens to pay this mortgage, the same as if Ackmoody owned the land, and the balance is to go to Albinus Pierce.'

" This memorandum was read and understood and assented to by all parties present. Plaintiff, D. S. Havens, went back to New York.

" In the fall of 1882, Alonzo Havens, in company with Albinus Pierce, came to the office of the defendant. Defendant was away, but Mr. Howd, the clerk above named, was present, and acted for the defendant. Alonzo Havens represented to the said Howd that he (Havens) was D. S. Havens, the plaintiff, and was entitled to the money so left with the defendant. Howd did not know or did not recognize the said Alonzo Havens, and believed he was D. S. Havens, the plaintiff, but he took no measures to inform himself as to his identity. Mr. Pierce was with him, who was known to Mr. Howd; but he did not ask Pierce as to the identity of Alonzo Havens, nor did Pierce introduce him, or say anything about him in any way. Howd computed the amount in defendant's hands, reserved as before stated, and gave the parties a check for the amount of the same on Church & Bills' bank, which was presented to the bank and paid. In this transaction, Howd was governed and controlled by the memorandum of the previous transaction appearing upon the book, and the full belief that the Havens to whom, together with Pierce, he paid the money, was the Havens mentioned in said memorandum, which belief was induced by the representations and conduct of Alonzo Havens and Albinus Pierce.

" Afterwards, and about September, 1883, Alonzo Havens came to the office of the defendant, in Ithaca, and again represented himself as D. S. Havens, negotiated a loan of the defendant upon the land in question, and, as D. S. Havens, executed a mortgage upon the land; and Howd, as the agent and clerk of the defendant, gave him about

$600 upon said mortgage, of which $500 was by draft and about $100 in currency. The draft the defendant afterwards recovered, but the currency he lost. A short time after taking this mortgage, the defendant discovered for the first time that the man who had been personating D. S. Havens was not D. S. Havens. The defendant never had any personal knowledge of any part of the transactions of April 22, 1881, or October 30, 1882, until after the last loan was made, in September, 1883."

1. It is first contended that there is no competent testimony on which to base the finding that there was an agreement between the plaintiff and the defendant, through his clerks, that the money in his hands should remain there to pay the Holden mortgage whenever it could be paid. We have examined the testimony, and cannot concur in this view. Plaintiff was interested at the time of his purchase in having this money applied upon the mortgage according to the agreement which is conceded to have been made with the defendant for such application. The testimony on the part of the plaintiff tends to show that an agreement was then made with Howd and Blackmer, defendant's clerks, that the defendant should keep the money for that purpose, and a memorandum to that effect was made upon his books. It was deposited under some arrangement, and no other is suggested. It is unnecessary to set out the testimony.

2. The most doubtful question relates to the authority of the clerks to make this agreement. The situation is this: The defendant had left these clerks in the entire charge and control of his business, with full power and authority to act and bind him in every matter connected with the business. The defendant was present when the first arrangement was made, and the money was deposited to his credit in the bank of which he was the principal partner. He had expressly received it for the particular purpose, viz., to pay the mortgage when due, about three

years from that time, or when the mortgagee would receive it.   Defendant was legally bound to keep this money, and appropriate it for the purpose for which it was deposited with him, whenever the contingency arose.   In this situation he left his business in the hands of his clerks, and they evidently knew the purpose for which their principal received the money.   Plaintiff, by his purchase and the arrangement then made, became entitled to the benefit of it, and to have it applied in payment of the mortgage. The depositor had the right to assign it, and this was the effect of the arrangement.   Defendant's liability was neither enlarged nor changed by the agreement.   The deposit was left in charge of his clerks, and we think they were authorized to make the arrangement for him.

3. We do not think that the defendant was a bailee, as the court found.   A bailment implies a return of the identical thing which is the subject of the bailment.   It was not contemplated that the identical moneys should be kept.   It was a deposit of money, which the defendant took, and agreed to use in a specified manner.   The relation was rather that of principal and agent, or perhaps it is more accurate to say that it was one of trustee and cestui que trust.   Shoemaker v. Hinze, 53 Wis. 116; Marsh v. Titus, 3 Hun, 550.   In such case, payment to the wrong party cannot operate to excuse the defendant, and discharge him from liability.

4. The statute of limitations did not begin to run with the deposit of the money.   Part of this money was due to the mortgagee, Holden, and part to Pierce.   Plaintiff was not entitled to it until he had either paid the mortgage himself, or had demanded an accounting from the defendant.   The statute, in such cases, does not begin to run until an accounting is called for.   Kimball v. Kimball, 16 Mich. 211.

5. Plaintiff was the executor of his father's will, and

Alonzo, who defrauded the defendant in both this and the other transaction, for the latter of which he was convicted and sent to prison, was entitled to the use of this money. The farm was purchased with the funds of the estate, and, while the plaintiff took the title in his own name, Alonzo was entitled to the use and benefit of the farm, which he has had. This is admitted by the plaintiff. The action for money had and received is an equitable action, and plaintiff ought not to recover more than his actual loss. We therefore think that the judgment was erroneous, in that it includes interest.

The judgment will therefore be reversed, and judgment entered in this Court for $430, with costs to the defendant.

LONG, MONTGOMERY, and HOOKER, JJ., concurred. McGRATH, C. J., did not sit.